OF THE

## STATE OF MISSOURI

AT THE

### OCTOBER TERM, 1907.

*(Continued from Volume 207)*

## CATHERINE LYNCH v. CHICAGO & ALTON RAILWAY COMPANY, Appellant.

### Division Two, December 10, 1907.

1. **EVIDENCE: Witnesses Dead: Hearsay.** A statement by plaintiff's witness on cross-examination that he understood and had heard that the unnamed engineer and fireman in charge of defendant's train which it is charged struck deceased, were dead at the time of the trial, was the merest hearsay, and did not establish the fact that they were dead.

2. ———: **Admission in Original Answer.** An allegation in defendant's original answer, setting up the facts which constituted plaintiff's contributory negligence, may be weighed by the jury as an admission, namely, that deceased was on his velocipede car on the track at the time he was struck by defendant's engine, in which, in support of that plea, it is averred that deceased "was in the employ of defendant and that it was his duty to run a velocipede car over defendant's track" and that deceased "was riding along the track of defendant upon his track bicycle and failed to keep a proper lookout for trains," etc.

( 1 )

3. ——: **State of Facts: Continuance.** A state of facts once shown to exist is presumed to continue until the contrary is shown. Where it was shown that deceased was on his velocipede car when last seen as he passed around a curve, it will be presumed that he was still on the velocipede when struck by a following train two or three moments later, in the absence of evidence to the contrary.

4. **NEGLIGENCE: Demurrer to Evidence: Conjecture: Cyclist on Track: Seen.** A regular passenger train went east, and immediately deceased, a signal man whose duty it was to inspect and keep in proper repair the automatic electric block signals, placed his velocipede car on the track and followed after the train, looking back as he went. The track rounded a curve through a cut, and he passed out of view, and two or three minutes later there followed an irregular engine running backwards at the rate of twenty miles an hour, both the engineer and fireman facing and looking eastward. At the next station blood was seen on the wheels and brakes of the engine, and information came to the conductor waiting there that a man had been killed or injured. He found deceased lying near the track a mile and a half east of where he had placed his velocipede on the track, badly mangled, and the velocipede, smashed to pieces, was five or six hundred feet further east. For more than a half mile west of the place where deceased lay the track was straight and nothing obscured or obstructed the view. Defendant offered no evidence. *Held*, that there was sufficient evidence from which the inference could be logically drawn that deceased was seen by the engineer and fireman, that a verdict was not based on mere conjecture, and that a demurrer to the evidence was properly overruled.

5. ——: ——: **Seeing Man on Track.** If the engineer and fireman saw the deceased signal man on his velocipede on the track, in time to have stopped their engine before striking him and did not, the defendant is liable, although deceased was himself guilty of contributory negligence in not looking back for the approach of their irregular engine. And actual notice or knowledge of his presence on the track may be established by direct testimony or inferred from facts and circumstances in evidence; an opportunity to know will under some circumstances go far to establish knowledge. It may be inferred from the fact that they had an unobstructed and unobscured view for more than a half mile of deceased proceeding on his velocipede on the track in front of the engine.

6. ——: **Perilous Position: Unaware Thereof.** That deceased was in a perilous position and was unaware thereof is shown by the fact that no whistle was sounded or alarm signal given, that his velocipede made considerable noise, that the train was run-

ning at a rapid rate and did not stop, and by an allegation in the original answer that he did not keep a lookout for the engine following him.

7. ———: **Contributory Negligence: Knowledge of Wild Engine.** The signal man on his velocipede car at his work inspecting the block signals is not charged with knowledge that an irregular and "wild" engine will be run backwards at a rapid speed two or three minutes behind a passenger train which he himself followed immediately after its passage on schedule time.

8. ———: ———: ———: **Block System.** The signal man following on his velocipede the regular passenger train had little reason to anticipate that an engineeer and fireman on an irregular engine would disregard the common practice governing trains operating under the block system, which was for a train crew, when they approached an automatic signal block and found that the semaphore indicated another train was in the block, to stop and wait five minutes and send a flag ahead and proceed slowly with the train under ready control.

9. ———: ———: **Signals: Knowledge of Train.** A signal man, on his velocipede car in the performance of his duty, is as much entitled to the track as a train; and where he had no knowledge of the irregular engine following him, and no alarm signals were given him, although he was in plain view of the engineer and fireman for more than a half mile, he cannot be said, as a matter of law, to be guilty of such contributory negligence as bars a recovery, for failure to look back, etc.

10. ———: ———: **Defendant's Duty Nevertheless.** Although the signal man was guilty of contributory negligence, it was the duty of those in charge of the engine following him, when they saw him running his velocipede in plain view for more than a half mile and in no way indicating his knowledge of their approach, to exercise reasonable care for his safety and not run over him. It was their duty to warn him, and slow down the train, and even stop if necessary in order to save his life.

11. **PLEADING: Amendment: Change of Venue Pending.** It is the order of the court granting a change of venue that divests the court of jurisdiction, and not merely the filing of an application for a change. So that the court did not lose jurisdiction over the case by the filing of an application for a change of venue asserting the disqualification of the judge.

12. ———: ———: ———: **No Bill of Exceptions.** An alleged error of the trial court in permitting an amendment to the petition to be made, after an application for a change of venue, asserting the judge's disqualification, had been filed, and while said application was still pending, is not reviewable upon appeal, unless a bill of exceptions is filed in the court granting the

change, although defendant at the time leave to amend was granted objected and excepted.

13. EVIDENCE: Speed of Trains. One whose duties required him to ascertain if trains were on time, who kept railroad time, and whose place of work gave him daily opportunity for a long time of observing the speed of trains at that place, is competent to testify as to the speed of a particular train as it passed that place.

14. ————: ————: Continuance. It is allowable for a jury to infer that a train continued to run for a mile or more, down grade, in the country, at the same rate of speed it was going when last seen, in the absence of all whistling and any evidence to the contrary.

15. ————: Expert: Stopping Train. Within what distance a train can be stopped in a given case with safety to property and the lives of persons thereon, must depend on many things: the grade of the track, the speed of the train, its size, the kinds of brakes used, etc.

16. ————: ————: ————: Competent Expert. A witness who had been working with and about locomotives for seven years, had ridden on engines and trains, had seen the engineers manipulate the appliances for stopping trains, and stated he knew from his observations the distance in which an engine and tender could be stopped, but who had never been an engineer or fireman, is not competent as an expert to testify as to the distance in which an engine and tender, running between stations in the country at a speed of twenty miles an hour, can be stopped.

17. ————: ————: ————: ————: Non-Prejudicial. The testimony of a person who does not qualify as an expert that the train could have been stopped within two or three hundred feet is not prejudicial if the testimony does not materially affect the issues, as, for instance, where there is no testimony that any effort was made to stop the train or to give an alarm signal and those in charge of it could have seen deceased on his velocipede on the track ahead of them more than a half mile.

18. ————: Insufficient to Sustain Verdict: General Assignment: No Minor Children. A judgment for the mother of deceased will not be reversed on the ground that she did not prove, if it was a fact, that deceased left no minor children surviving him, when the motion for new trial contains no more specific assignment than that "the verdict is not supported by the evidence, and the cause being founded on a special statute the plaintiff did not prove facts sufficient to bring herself and this

cause within the purview of such statute," and where the question of whether he left minor children was in no way mooted either in the evidence or instructions.

19. ——: ——: ——: ——: **Proof.** Even if the motion for new trial contained a sufficiently specific assignment that there was no proof that deceased left no minor children, a judgment for his mother will not be reversed if there was proof that deceased was a minor and was single and unmarried, in the absence of any effort to show that he had ever been married, for that testimony justified the jury in finding that he left no minor children.

Appeal from Pike Circuit Court.—*Hon. D. H. Eby,* Judge.

AFFIRMED.

*W. O. Gray* and *Scarritt, Scarritt & Jones* for appellant.

(1)    The demurrer to plaintiff's evidence should have been sustained. If plaintiff has failed to prove by substantial evidence any one or more of the necessary allegations of her petition, she has failed to make a case. In a case of this kind a verdict and judgment may not stand upon mere conjecture or guess. Moore v. Railroad, 28 Mo. App. 622; Petty v. Railroad, 179 Mo. 666; Warner v. Railroad, 178 Mo. 125; McGrath v. Railroad, 197 Mo. 97; Jolly v. Railroad, 93 Mich. 370; Yarnall v. Railroad, 113 Mo. 580; Railroad v. Cathy, 70 Miss. 332; Short v. Railroad, 69 Miss. 848; Ogelsby v. Railroad, 177 Mo. 272; Wintuska's Admr. v. Railroad, 20 S. W. 819; Corcoran v. Railroad, 133 Mass. 507; Rogers v. Railroad, 88 Fed. 462; The Columbia, 106 Fed. 745; Railroad v. O'Brien, 132 Fed. 593; Railroad v. Shertle, 97 Pa. St. 450.    (2)    The court erred in overruling the motion to strike out the amendment to plaintiff's petition. Sec. 824, R. S. 1899; State ex rel. v. Smith, 176 Mo. 90; Lacy v. Barrett, 75 Mo. 469; State to use v. Rayburn, 31 Mo. App. 396; State ex rel. v. St. Louis, 67 Mo. 113.    (3)    The court erred in permitting

witness Emil Smith to testify as to the speed of the engine in question when it passed this witness a mile and a quarter west of the place where the body of John Lynch was found. The witness did not show any qualification whatever to express an opinion about the speed of this train. Petty v. Railroad, 179 Mo. 666; Muth v. Railroad, 87 Mo. App. 434; Helm v. Railroad, 185 Mo. 122; Campbell v. Railroad, 175 Mo. 161. The speed of the train at that point, when the engine had but shortly left the station at Higginsville and was at the time proceeding through a heavy cut and around a sharp curve, had no tendency whatever to prove the speed of this engine at the point where it is claimed the engine struck John Lynch, at which point the engine was running on a straight track down a heavy grade. Possibly this testimony was offered on the doctrine sometimes enunciated, that what is shown to exist at one time is presumed to continue to exist until the contrary is shown. The doctrine is by no means one of universal application, but is confined to cases of sanity, possession, insolvency, and the like, where the natural order of things is a continuation of the conditions shown at some certain time to be in existence. Johnson v. Johnson, 170 Mo. 56. (4) The court grievously erred in permitting witness N. Jacks to answer the hypothetical questions propounded to him by counsel for plaintiff with reference to the distance within which an engine and tender could be stopped. This witness was not shown to be qualified to testify as an expert on this matter. He had never operated an engine or worked on an engine or railroad train in any capacity whatever. Gourley v. Railroad, 35 Mo. App. 92. (5) Plaintiff wholly failed to prove her right to maintain this action because she did not prove, if it was a fact, that deceased left no minor children surviving him. Barker v. Railroad, 91 Mo. 86; McIntosh v. Railroad, 103 Mo. 131; O'Malley v. Railroad, 113 Mo. 319.

*P. H. Cullen, Tapley & Fitzgerald* and *Thad C. Cox* for respondent.

(1) The proof showed that the death of Lynch was caused by the carelessness and negligence of the servants in charge of the train, and therefore plaintiff was entitled to recover. Schlereth v. Railroad, 115 Mo. 87; Payne v. Railroad, 105 Mo. App. 155; Sullivan v. Railroad, 97 Mo. 113; Kelley v. Railroad, 95 Mo. 278; Eppstein v. Railroad, 197 Mo. 720; Railroad v. Jacobson, 28 Tex. Civ. App. 150; Hawley v. Railroad, 71 Iowa 717; Railroad v. Simpson, 86 S. W. 1034; Slette v. Railroad, 55 N. W. 137; Railroad v. Erb (Ind.), 73 N. E. 939; Howard v. Canal Co., 40 Fed. 195. (2) The evidence did not show that deceased was guilty of contributory negligence as a matter of law, and the instruction assuming that he was guilty of negligence was too favorable to defendant. Slette v. Railroad, 55 N. W. 137; Railroad v. Seibert, 55 S. W. 892; Walker v. Shelton, 59 Kan. 774; Hawley v. Railroad, 71 Iowa 717; Railroad v. Simpson, 86 S. W. 1034; Woodard Iron Co. v. Herndon, 114 Ala. 191, 130 Ala. 364. (3) That negligence may be inferred from circumstances there is no doubt in reason or upon authority, and likewise the due care of the person injured or killed may be proven by circumstances. 3 Ency. Ev., p. 103; 6 Thomp. Neg. (2 Ed.), secs. 7863 and 7912; Black v. Telephone Co., 26 Utah 451; Rine v. Railroad, 100 Mo. 228; Harned v. Railroad, 51 Mo. App. 482; Haynes v. Railroad, 54 Mo. App. 585; Rosenfield v. Arrol, 44 Minn. 393; Railroad v. Gunderson, 51 N. E. 708; Kearney Canal Co. v. Akeyson, 63 N. W. 921; Lighthouse v. Railroad, 54 N. W. 321; Union Stock Yards v. Conover, 41 Neb. 677.

GANTT, J.—This action was instituted by the plaintiff Mrs. Lynch, to recover damages under section 2864, Revised Statutes 1899, for the death of her son John Lynch, which occurred on August 31, 1902.

Prior to and at the time of his death John Lynch was in the employ of the defendant company as a "signal man"; that is, it was his duty to inspect and keep in proper order the automatic electric block signals and bells along a certain section of defendant's line in Lafayette county, from Higginsville to Alma.

The petition alleges that the said John Lynch was killed by the defendant on or about August 31, 1902, at the place and under the circumstances herein stated.

Plaintiff states that her son John Lynch was in the employ of the defendant railroad company, and that it was his duty to run a velocipede car over the defendant railroad company's track between the stations of Higginsville and Alma; that on or about the 31st day of August, 1902, her said son in the discharge of his duties as aforesaid was operating his velocipede car on said tracks and was running the same east from Higginsville to Alma; that while he was so upon said track operating said velocipede car, an engine owned, operated and controlled by the defendant railway company, its agents and servants, was carelessly and negligently run east over and along said tracks; that the agents and servants of the railway company knew that deceased was upon the track as aforesaid, and could have known it by the exercise of ordinary care, and carelessly and negligently failed to give any signals of the approach of said engine and carelessly and negligently failed to stop said engine, but on the contrary carelessly and negligently ran the same with great force and speed into, against and upon the plaintiff's said son and his car. Plaintiff says that the said defendant knew that her said son was upon the track and knew he was in a position of peril and unaware thereof, for a long time before said engine collided with him and the said velocipede; that after said servants discovered the situation they could have stopped the engine and avoided striking and killing plaintiff's son, but negligently and care-

lessly failed to do so. There were other charges of neg-
ligence in the petition, but the cause was submitted
upon the above allegation of negligence. There was a
prayer for judgment for five thousand dollars damages
and costs.

The answer denied each and every allegation in the
amended petition. There was also a plea of contribu-
tory negligence and an assumption of risks. There was.
also a plea to the jurisdiction of the court over the
subject-matter of the case.

The reply was a general denial of the new matter
set up in the answer.

On the trial the plaintiff introduced in evidence
the original answer of the defendant, which among
other things contained the following allegation: "That
the said John Lynch was in the employ of the defend-
ant and that it was his duty to run a velocipede car
over defendant's track at and between the stations of
Higginsville and Alma and other places on the line of
defendant's road. . . . That said John Lynch was
riding along the track of the defendant upon his track
bicycle and failed to keep a proper lookout for trains
that were constantly run upon said track and upon the
approach of one of said trains, failed to remove from
said track and otherwise negligently and carelessly
conducted himself in the premises."

The testimony on the part of the plaintiff tended
to prove that John Lynch, the deceased, was the son of
Catherine Lynch, the plaintiff herein, at the time of his
death; that the plaintiff is a widow and that at the time
of his death John Lynch was about twenty years of
age, single and unmarried. The evidence also estab-
lished that Higginsville and Corder are stations on the
defendant's line in Lafayette county, Missouri, and that
Corder is about five miles east of Higginsville. The
usual time consumed by passenger trains from Higgins-
ville to Corder is nine or ten minutes. The defendant

company has in use upon its railroad what is known as the automatic block system. There was a block just east of Higginsville for east-bound trains between Higginsville and Corder and another one just west of Corder to cover the track between Corder and Higginsville, and at either end of this block is an electric signal. There is also a semaphore at Higginsville and one at Corder. It is in evidence that when an arm of a semaphore was down it indicated that a train could proceed with safety, but when it was extended it indicated danger. It was explained by the witness that after the east-bound train passes Corder, if there was no train on the block between Higginsville and Corder, the arms of the semaphore will be down, but if there is another train between Higginsville and Corder the arms will stand at right angles. There was also evidence tending to show that it was the practice of the train crews when they approached one of these automatic blocks and found that the block was at danger or against them, to stop and wait five minutes, and send a flag on ahead of them; after the flag had been out for a given length of time, the train would proceed on behind the flag under control until they went the entire limit of the block; that the train would go through the block slowly and ready to stop on short notice and the train crew would be on the lookout and at the post of duty ready to stop the train on short notice. The evidence tended to establish that on the morning of August 31, 1902, the deceased, John Lynch, started out from Higginsville on his tour of inspection of the electric apparatus connected with this automatic block between Higginsville and Corder. He was seen by the witness Emil Smith, who was employed at a coal mine on the defendant's road a mile and a quarter east of Higginsville, at work at a switch block a little west of this coal mine, about five or ten minutes before the regular passenger train going east from Higginsville to

Corder came along. This train was due at Higginsville about 9:38 a. m. The engine which afterwards killed Lynch came from the east and went to Higginsville along this same track about five or ten minutes before the passenger train went east. As soon as the passenger train passed going to Corder, Lynch, the deceased, put his velocipede on the track and looked back towards Higginsville and started east towards Corder. He rode four or five telegraph poles before going around the curve, he looked again before he got into that curve, and was last seen by this witness as he went around the curve, and as he went he continued to look back west. About two minutes and a half after the deceased passed around the curve, an engine running backwards came along following the deceased going towards Corder from Higginsville. The engineer and the fireman were on the engine and were facing east and looking east. The engine was running about twenty miles an hour. The engine was in sight of the witness for a quarter of a mile after it passed the coal chute when it passed out of his sight by reason of the curve. The witness testified that the engine did not at any time give any signal in the way of a whistle. It was a clear day, still, and no wind blowing. The schedule time of the passenger train from Higginsville to Corder was ten minutes. It was due at Higginsville at 9:38 and at Corder at 9:48. The testimony tended to show that the engine which followed the deceased arrived at Corder that morning not longer than three minutes after the passenger train. Testimony further tended to show that the deceased usually ran his velocipede from Higginsville to Corder between 9:30 and ten o'clock in the morning, and it was his custom to go either ahead of the mail train, or a little after, and he had been so traveling for about two or three weeks.

Neil Lewis, a witness for the plaintiff, testified that his business was that of an engineer. He had worked

a short time at the railroad business, he was at Corder on the day that young Lynch was killed, and was at the depot when the passenger train came in; it left there about ten o'clock. He testified also that after the passenger or mail train came into Corder from Higginsville, a loose engine also came in following it not longer than three minutes after the passenger. It was just an engine backing from Higginsville to Corder. After the arrival of that engine, he went on another train to Higginsville that same morning and saw the body of John Lynch; it was just forty-five feet east of the whistling post between Hays crossing and Randolph crossing, or a mile or a mile and a quarter from the Randolph coal chutes, about half way between Corder and Higginsville. The body was lying on the south side of the track and was considerably mangled. He testified that, from the point where the body was found, the track was perfectly straight west for a half mile or seventeen telegraph poles, and that a person could from an elevation see an object for twenty-three telegraph poles west. There was nothing to obstruct the man's view of an engine approaching for twenty-three telegraph poles west. He testified further that after the arrival of this loose engine at Corder that morning, he examined it and the wheels and the brake beam were covered with blood. He testified also that he had been a fireman in the railroad service some six or seven weeks and he was asked to state from his experience within what distance an engine and tender could be stopped running at a rate of 15 or 20 miles an hour by an application of the emergency appliances, and he stated that it could be done in from three to five minutes. The evidence tends further to show that the engine which caused the death of John Lynch had pulled a freight train into Corder from the east that morning and had been detached there from the train, and for some unexplained reason ran west to Higginsville

with no one on it but the engineer and fireman; that the conductor and brakeman on that train remained at Corder while the engineer and fireman·took the engine to Higginsville and back. After the return of this engine to Corder with the wheels and brake beam stained with blood, the conductor had the engine attached to the caboose and requested four other citizens to go with him to the place where the deceased was killed, as information that a man had been hurt had been received at Corder. One of these citizens, Mr. Cramer, testified that he was one of the four who went with the conductor and brakesman on that mission. He testified that they found the body of the deceased about forty-five feet east of the whistling post and that it was badly mangled, and they took him up and placed him on a door of the car and put him in the caboose and took him to Higginsville. He testified that he walked back that afternoon from Higginsville to Corder and discovered nothing west of the place where the body was found, but east of that point he found the velocipede broken up; it was about twenty-one rails east of where they picked up the body, and on the north side of the track. This witness also testified that the passenger train arrived at Corder that morning about 9:48. There was evidence also to the effect that a railroad velocipede such as was used by the deceased on this occasion makes a good deal of noise as it is being propelled along the track and that a man riding it must protect himself mostly by his sight.

Mr. N. Jacks, a witness for the plaintiff, testified that he had been working at and about railroads and locomotives about seven years; that he had not run an engine himself either as engineer or fireman, but had had occasion to see locomotives started and stopped and observed the distances in which they could be stopped when running and had ridden on trains and in engines and had opportunities to make observations as to dis-

tances within which an engine or train could be stopped; and that a locomotive engine and tender such as is used in the ordinary freight service, equipped with air and being run on a straight track in dry weather on a grade slightly down and being operated at a rate of fifteen or twenty miles an hour with the engineer and fireman in their proper places on the engine, could be stopped in a distance of two or three hundred feet by shutting off the steam and using the air brakes.

The defendant offered no evidence, but at the close of the plaintiff's case asked an instruction in the nature of a demurrer to the evidence, which the court overruled and the defendant duly excepted. The court thereupon of its own motion instructed the jury as follows:

"The court instructs the jury that although the jury may find that John Lynch was in a perilous situation, yet if the jury find that he knew of the approaching engine, if any, and if the jury further find that the defendant's agents, if any, in charge of said train, had good reason to believe and did believe that said Lynch would escape from his perilous position, if any, without being struck by said engine, then the situation of said Lynch was not the perilous position referred to in plaintiff's instruction No. 1, and in such case the absence of ordinary care cannot be inferred from the fact that defendant's agent did not in fact stop said engine before it struck said Lynch, if it did strike him."

The court then instructed the jury at the request of the plaintiff as follows:

"If you believe from the evidence that the defendant was a corporation engaged in operating a railroad between Higginsville and Alma, Missouri; that the deceased John Lynch, at the time of his death, was in the employ of said defendant, engaged in the work of assisting the defendant in the operation of a railroad; and if you further believe that he was, at the time

of his death, unmarried and under the age of twenty-one years, and that his father was dead, and that the plaintiff herein is his mother; and if you shall further believe that at and for some time before the time John Lynch was killed he was employed by the defendant to look after and care for appliances in use by defendant along its road, and that in pursuance of said employment it was his duty to pass over defendant's tracks on a velocipede; and if you further find and believe from the evidence that on the morning of September 1, 1902, immediately after the passing of an east-bound train, the said John Lynch put his velocipede upon the track at a point near Higginsville and ran said velocipede east after said passenger train along defendant's tracks; and if you further believe that when about one mile and a quarter from the point where he started the said John Lynch was struck and killed by an engine backing east on said track; and if you further believe that the deceased had been, for a long time prior to this time, in the habit of passing east along said track between Higginsville and Corder at about this hour of the day; and if you further believe that John Lynch, while operating said velocipede upon defendant's track, became in imminent peril of being struck by defendant's engine, and defendant's employees in charge of said engine knew of his peril of being struck in time to have stopped said train and to have averted the injury to said deceased; and if you shall further believe that they failed to exercise such care and stop said engine, and that by reason of such failure to exercise such ordinary care the said engine was not stopped, and said John Lynch was struck and killed, then the jury must find for the plaintiff, though the jury may find that the deceased, John Lynch, was guilty of negligence in running the velocipede upon the defendant's track at the time.

"The court instructs the jury that if you find for

plaintiff your verdict should be .for $5,000; no more nor no less.''

The court also gave the following instructions for the defendant:

''The court instructs the jury that even though you may believe that the men in charge of the engine in question could, by the exercise of ordinary care, have seen the deceased upon the track ahead of the engine in question, yet plaintiff is not entitled to recover on that account; but it is incumbent upon the plaintiff to prove to your satisfaction by credible testimony that the men in charge of said engine did in fact see the deceased on the track ahead of them and in a position of peril, and, further, that they had reason to believe and had good reason to believe that the deceased did not realize his danger and would not escape therefrom without being struck; and, further, that after so observing deceased in such position of peril they failed to use the means at hand to avoid injury to deceased.

''The court instructs the jury that the fact that there was a collision between the engine in question and John Lynch, the deceased, if you find there was such collision, is not in itself any evidence of negligence on the part of the men in charge of such engine.

''The court instructs the jury that in the absence of evidence to the contrary you must presume that the men in charge of the engine in question at and just prior to the injury of deceased were exercising ordinary care.

''The court instructs the jury that a recovery by the plaintiff must be based upon substantial evidence and not upon speculation or conjecture as to the causes of a collision between the engine mentioned in the evidence and John Lynch, if the jury shall believe from the evidence in the cause that there was such collision.

''The court instructs the jury that it was the duty of John Lynch at the time in question, to look out for

his own safety, and that it was his duty to keep a sharp lookout for approaching trains from both directions, and that in the absence of evidence to the contrary you must presume that the said John Lynch saw the engine in question approaching him before he was struck by the same."

I. The principal contention of the defendant is that the demurrer to the evidence should have been sustained by the circuit court and the cause taken from the jury.

It is conceded by the learned counsel for the defendant that on the morning of August 31, 1902, John Lynch was in the employment of the defendant and that it was his duty to go over the line of the defendant from Higginsville to Alma to inspect and see that the electric apparatus maintained by the defendant for the control of its automatic block system between those stations was in good working order, and that for that purpose he was authorized to use a railroad velocipede on the tracks of the defendant and that on that morning he got on his velocipede at a signal station just west of the Randolph coal mines, and immediately after the passenger or main train going east passed said coal chute, and started east following said passenger train. The evidence further tends to show, without any contradiction, that as the deceased rode east he turned his head backward and to the west several times before he entered a cut or curve about a quarter of a mile east of the coal chute, after which he was not seen by any witness until his dead body was found about a mile and a quarter east of the point where he was last seen by the witness Smith who was stationed at the coal chute. The testimony also shows that from two and a half to three minutes after Lynch, the deceased, passed east around the curve an engine of the defendant in charge of an engineer and fireman followed going east running about twenty miles

an hour, and that the fireman and engineer on said engine had their faces turned to the east and were looking in that direction, and that this engine reached Corder about three minutes after the passenger train arrived at that point and that when it reached there the forward wheels and the brake beam were stained with blood. It also appeared that information had reached the conductor of the freight train to which this engine belonged that a man had either been killed or injured, and accordingly four other citizens were requested to go with the train in the direction of Higginsville, and the body of the deceased was found about half way between Higginsville and Corder, and was taken aboard the train and conveyed to Higginsville. Counsel for the defendant concedes that from the foregoing facts the conclusion may be drawn that John Lynch was killed by coming in contact with that engine, but, further than that, they insist all is conjecture and guess work. They assert that the lips of the engineer and fireman in charge of this engine and tender are sealed by death. As to this the only evidence that the fireman and engineer in charge of that engine on that day were dead at the time of the trial appears in the cross-examination of the witness Jacks in the following interrogatories and answers: "Q. Do you know where the engineer and fireman are of the engine that has been spoken of here? Ans. No, sir, I do not. Q. You understand, do you not, that they are dead? Ans. I have heard that, yes, sir." Nowhere in the record is it disclosed what were the names of the fireman and the engineer in charge of that engine which killed Lynch that morning. It is too obvious for discussion that the testimony of Jacks that they were dead was the merest hearsay, and if they were dead at the date of the trial, that fact was not established by any competent evidence. That the jury were fully justified in finding that John Lynch, the signal man, was struck and killed by that engine under

the facts already narrated, we think is too plain for discussion.

But the learned counsel for the defendant insists that conceding he was struck by the engine, there was no evidence that at the time of his death and just prior thereto, John Lynch was upon his velocipede on the railroad track. In support of the allegation in the petition that John Lynch was on his velocipede at the time he was struck and killed by said engine, the plaintiff among other things calls attention to the original answer filed by the defendant in this cause wherein it admits that "John Lynch was in its employment and that it was his duty to run a velocipede car over its tracks at and between the stations of Higginsville and Alma" and then alleges that the injuries received by the said Lynch were in part caused by his own negligence, which directly contributed thereto, in this, "that the said John Lynch was riding along the track of defendant upon a track bicycle and failed to keep proper lookout for trains that were constantly running upon said track and upon the approach of one of said trains, failed to remove from said track and otherwise negligently and carelessly conducted himself in the premises." That it was competent for the jury to weigh this allegation of the defendant's original answer as an admission that the deceased was struck and killed while he was operating his velocipede on the track, we also think is well settled. [Walser v. Wear, 141 Mo. l. c. 463, 464, and cases cited; Spurlock v. Railroad, 125 Mo. 404; Mahan v. Brinnell, 94 Mo. App. l. c. 171.]

But in addition to this admission in the answer made by the defendant when the cause was yet new, the testimony established that when last seen the deceased John Lynch was operating his velocipede on the track and traveling east about two and one half or three minutes ahead of the engine, which afterwards struck and killed him, when it passed the curve east of the Ran-

dolph coal chute, and the evidence shows that not only was Lynch himself struck and mangled by the engine, but the velocipede was smashed and broken when it was found some five or six hundred feet from where his body lay on the side of the track. The principle that a state of facts once shown to exist will be presumed to continue until the contrary is shown, has been long recognized in this State. [Pope v. Railroad, 99 Mo. l. c. 404 and 405; State v. Lowe, 93 Mo. l. c. 571.] And hence when the plaintiff had established that John Lynch was riding on his velocipede on the morning of his death going east and that the engine and tender which struck and killed him was following about two and one half or three minutes later on the same track and moving at a rate of twenty miles an hour, and in a few minutes afterwards his body was found mangled on the side of the track, and the velocipede he was riding was also smashed and broken up a short distance east of where his body was found, we think the jury were clearly authorized to infer that when he was struck and killed he was yet upon the velocipede in the absence of all evidence to the contrary. Nor do we think this inference is rebutted by the testimony that signal men would frequently stop along the section to work on matters that might need attention, nor by the conjecture of counsel for the defendant that it was possible that he had gotten off of his velocipede and was engaged in examining the electric apparatus, or that he might have left his velocipede on the track while he got off to examine or repair the apparatus. There was not the slightest testimony tending to confirm either of these conjectures; on the contrary, as already said, the admissions of the defendant in its original answer, taken in connection with the known facts in evidence as to the relative position of the deceased and the engine following him, presented an exceedingly reasonable inference that he was yet on his velocipede when the en-

gine and the tender overtook him and killed him and broke up his velocipede.

But it is insisted that there was absolutely no evidence that the engineer and fireman of the engine actually knew that John Lynch was upon the track ahead of their engine. It is true, as already stated, the day was clear, the track for a distance of from a half to two-thirds of a mile from the west to where the deceased was struck was straight, and the velocipede and the man thereon was an object that could not escape being seen by the engineer and the fireman with their faces turned towards the east, the direction in which their engine and tender and the velocipede were traveling at the time. As was said in Reyburn v. Railroad, 187 Mo. l. c. 575, "The engineer and fireman could not help but see unless they purposely shut their eyes. And it is a fact to be considered in this connection that the defendant failed to call either the engineer or fireman as a witness." In Rine v. Railroad, 100 Mo. l. c. 234, BLACK, J., speaking for this court, said: "Evidence of negligence need not be direct and positive. 'In the nature of the case, the plaintiff must labor under difficulties in proving the fact of negligence, and as that fact itself is always a relative one, it is susceptible of proof by evidence of circumstances bearing more or less directly upon the fact of negligence, a kind of evidence which might not be satisfactory in other classes of cases open to clearer proof.' [1 Shear. & Red. on Neg. (4 Ed.), sec. 58.] A demurrer to the evidence admits every fact which the jurors may infer from the evidence before them, and should be allowed only when the evidence thus considered fails to make proof of some essential averment. [Noeninger v. Vogt, 88 Mo. 592, and cases cited.] All the circumstances surrounding the accident are to be considered, and, when this is done, we are of the opinion that there is evidence from which the jury could well find that the fireman at least saw

Rine on the track, and that, too, in time to have saved his life.'' In Schlereth v. Railroad, 115 Mo. 87, a case in which a track-walker was killed, the opinion of this court In Banc in reciting the facts says: ''The deceased started west, walking on the track. The road was level and the view along the track unobstructed. The engine and tender followed in a few minutes and had proceeded about one thousand three hundred feet when whistles from the engine were heard, and deceased was seen immediately lying beside the track. . . . The evidence shows that the deceased had worked for a number of years on the track of defendant's road in the city of St. Louis, and was perfectly familiar with the running of trains thereon. . . . Deceased started to his work walking on the track upon which trains going in the same direction were run. No witness saw the train strike deceased and it does not appear that he was struck while on the track or beside it.'' Upon this state of facts the court held a verdict for plaintiff was sustained by the evidence and the summary of the holding is as follows: ''The deceased, a track-repairer in the company's service, while walking along its tracks to work was killed by a locomotive going in the same direction. The track was level and the view unobstructed. The engine and tender had followed the deceased a few moments after he started and had only gone about one thousand three hundred feet when the accident occurred. *Held,* that while the deceased may have been guilty of contributory negligence in walking upon the track and in not seeing the engine, yet the case was properly submitted to the jury on the issue whether the engineer used proper care to see the danger in which the deceased had placed himself and to avoid injuring him.'' In Payne v. Railroad, 105 Mo. App. 155, the plaintiff was riding a velocipede upon the track, and the Kansas City Court of Appeals, through Judge ELLISON, said: ''There being evidence, the ten-

dency of which was to show that plaintiff was rightfully on the track, and especially that defendant's servants knew he was usually going over the track at the time of the accident, it became the duty of such servants to keep a vigilant lookout for him, and if by such watchfulness they could have discovered him in time to have avoided the collision, the defendant is liable for their failure to do so. And even though it be considered that plaintiff was negligent in not looking back, when by so doing he might have discovered the approaching engine in time to have gotten off of the track, yet, if defendant's servants might have seen him by proper watchfulness and care, a liability arose in his behalf, notwithstanding his own carelessness.'' In this case it appears that the deceased had for several weeks been regularly employed in inspecting the electrical apparatus that was used in connection with the automatic block system between Higginsville and Corder, and that he regularly rode upon the railroad bicycle between these stations in going to and from his work and that, on the morning in question, the engine and tender which afterwards struck him had passed west over this section of the road going into Higginsville, and there was evidence tending to show that at the time he was engaged in inspecting the signals near Randolph coal chutes. It is also in evidence that when this engine returned east following the deceased, it was running backward with the tender in front and it was not only their duty under such circumstances to keep a lookout, but the evidence shows that only a very few minutes before they struck him they were actually looking ahead. From the time they turned the curve east of the coal chute until they struck him, the track was straight and unobstructed and the day was clear and bright and there was absolutely nothing to keep them from seeing an object as large as a velocipede with a man upon it. Even if they had testified that under these circumstan-

ces they did not see Lynch, the jury were not bound to accept their statement as true. [Payne v. Railroad, 136 Mo. 1. c. 575.] As said in the Rine case, knowledge like actual notice may be proved by direct evidence or it may be inferred from facts and circumstances; when it is inferred from the facts and circumstances it is as actually knowledge as when proved by direct evidence; an opportunity to know will under some circumstances go far to show knowledge, and under other circumstances it may be of little value. So that, given the facts that the deceased was on his velocipede on the track on a clear morning with no obstruction and the engine and tender following immediately behind him after an interval of not more than three minutes with the engineer and fireman in their places and looking east in the direction of the velocipede, there was ample evidence tending to show that the engineer and fireman saw the deceased on the track ahead of them and, too, that they saw him in ample time to have prevented the engine from striking him. [Eppstein v. Railroad, 197 Mo. 720.]

The next proposition urged in support of the demurrer to the evidence is necessarily closely associated with the last contention, and that is that there was no evidence that the deceased was in a position of peril and unaware thereof. If we are correct in holding that the evidence was sufficient to show that the engineer and fireman saw the deceased upon his velocipede moving east on the track in front of them, and they were propelling their engine at the rate of twenty miles an hour, and if as the defendant's original answer states John Lynch was keeping no proper lookout for trains in his rear, the conclusion is inevitable that he was in a position of peril from the approaching engine and tender and all the facts and circumstances indicated to the engineer and firemen that he was unaware of his danger, and although he might have been guilty of

negligence in not discovering that the engine and tender were following him, it was the duty of the engineer and fireman to have warned him of their approach and if necessary have stopped the engine and tender in time to have avoided striking him, but the evidence tends strongly to show that they did not give him any warning whatever, not even by sounding a whistle to notify him of their approach. But the learned counsel for defendant state that there is not a scintilla of proof that the engineer and fireman did not endeavor to stop the engine and tender. The defendant did not offer any evidence in this case and the plaintiff was unable to produce any witness who actually saw the collision, but the testimony itself shows that the engine and tender which struck and killed the deceased was following immediately behind the deceased and that no signal whatever was given to the deceased of its approach, and the testimony tended to show that an engine and tender could easily have been stopped, and that it was not stopped either before or after striking deceased we think is too clear for serious discussion; that it was going at a rapid rate of speed when it knocked the deceased off of the velocipede is evidenced by the fact that it continued and drove the velocipede before it some five or six hundred feet before throwing it from the track, and that it reached Corder only three minutes after the passenger train arrived there. It is significant that after striking the deceased and knocking him from his velocipede the engine and tender were not stopped and no effort made to go to the assistance of the unfortunate man, but that the engine proceeded making the usual schedule time between these stations into Corder. That the engineer and fireman could not have been ignorant of the injury of the deceased is demonstrated by the fact that although no other persons saw the disaster, information was conveyed immediately upon the arrival of this tender and engine at Corder to the con-

ductor of the train who had remained at Corder, and he at once besought the kindly offices of some of the by-standers at the station to return with him to the scene of the collision; that this information was conveyed by the engineer and fireman the jury could have no doubt. Had they tarried long enough to have stopped their engine and gone to the assistance of the unfortunate man and taken him upon their engine to Corder, it is clear that the engine would not have reached Corder within the schedule time, and such the instincts of humanity demanded at their hands. So that the express testimony that no signal of danger was given to the unfortunate man and the arrival of the train on schedule time at Corder, we think fully justified the jury in finding that no effort whatever was made to check the speed of the engine and tender which killed the deceased. There was positive testimony that the velocipede made considerable noise by its running and there was no proof that the running of a single engine and tender without any cars attached to it would have overcome the noise made by the velocipede and thus apprised the deceased of its approach.

Accordingly, in our opinion, the court committed no error in overruling the demurrer to the evidence and in submitting this cause to the jury as it did upon the first instruction given in behalf of the plaintiff.

II. But it is insisted that the deceased was guilty of such contributory negligence as will debar his mother from a recovery in this cause. In the consideration of this contention, it is to be noted in the first place, that the deceased was not a trespasser upon the track of the defendant at the time he was struck and killed, but was a servant of the defendant in the line of the duty imposed upon him by the defendant. It is alleged in the answer that the deceased under his employment went from time to time along the defendant's track upon a velocipede car for the purpose of

inspecting the electrical apparatus which the defendant had installed for the control of its trains on the block between Higginsville and Corder, and the evidence abundantly established that it had been his custom for several weeks at least prior to his death to go over this block either just before or after the passenger train which arrived at Higginsville on the regular schedule time about 9:38 each morning, and that on the morning in question, immediately after the passing of the passenger train, he put his velocipede on the track and started east in the performance of his duty. Following immediately, as he was, a regular passenger train, it cannot be said as a matter of law that he was guilty of negligence in having his velocipede upon the track on this block because by so doing he was in no danger of meeting a west-bound train at that time, nor was he chargeable as a matter of law with notice that another train or (wild) engine would follow so closely upon the heels of a passenger train and run at such a great rate of speed. Ordinary care is, of course, a relative term and in determining whether the deceased was in the exercise of ordinary care in running his velocipede upon this track at the time he was killed, it must be conceded that there were times, places and occasions when the defendant and the deceased alike were of the opinion that he could operate his velocipede on the track with reasonable safety, especially where the block system was in use, as it appears it was on the defendant's road between these stations at the time. Certainly it cannot be said that the deceased was charged with knowledge that a (wild) engine would be run backwards immediately following a passenger train and in such close proximity to it, and the uncontradicted evidence tended to show that this engine which struck him was only two and a half minutes behind the passenger train when it passed the Randolph coal chute, and arrived in Corder only three minutes

behind it.  Moreover, there was evidence which tended
to show that the passenger train which preceded and
this engine and tender which killed the deceased were
occupying the block between Higginsville and Corder
at one and the same time, and there was evidence that
it was the practice of the train crews when they ap-
proached one of these automatic blocks and found that
the semaphore indicated that another train was in the
block, to stop and wait five minutes and send a flag
ahead of them, and after the flag had been out a given
length of time the second train which had entered the
block would proceed on behind the flag under control
until it went the full length of the block; that the train
would go through the block slowly and ready to stop
on short notice.  It was a fair inference for the jury
to draw that, of all men, the deceased, who was in
charge of electrical apparatus governing trains on this
block, was fully acquainted with the rules and prac-
tice of the trainmen in handling their trains on these
blocks, and that he had little reason to anticipate that
the engine which killed him would proceed in disre-
gard of the common practice governing trains under
the block system.  There was also testimony that when
the trainmen observe a velocipede on the track, it was
their duty to signal him by sounding the whistle and
if he gave no evidence of leaving the track then it was
their duty to stop.  And the evidence in this case tended
to show that no such whistle or other warning was
given  the deceased, and as already said the noise of
his velocipede might well have prevented his hearing
the approach of the single engine and tender running
down grade and with no cars attached to it.  We think
that the court in these circumstances would not have
been justified in instructing the jury as a matter of
law that the deceased was guilty of such contributory
negligence as would bar a recovery by the plaintiff.  As

said by the Supreme Court of Minnesota in Slette v. Railroad, 55 N. W. 1. c. 138: "For one not employed in railway service to risk his life by attempting to run a hand-car in advance of a train known to be approaching, would, of course, be negligence. But such a conclusion is not a matter of course in the case of railroad sectionmen, whose duty requires them to thus be upon and pass over the railway, although there may be obvious danger in so doing. From the fact that such conduct is dangerous it does not necessarily follow that it should be characterized as negligence. The service necessarily involves exposure to danger, and the question of the propriety of the servant's conduct must be considered with regard to the nature of the service and the duties which he has to perform." The distinction made by the courts between those who are trespassers upon the tracks and those whose duty does not require them to be upon the tracks, and those who are rightfully on the track, has been announced by the courts in other jurisdictions. [Railroad v. Jacobson (Texas), 66 S. W. 1111; Railroad v. Seibert's Admr. (Ky.), 55 S. W. 892.] Among other cases the learned counsel for the defendant cite us to the case of Jolly v. Railroad, 93 Mich. 370, but we think the facts of that case are widely different from those presented by this record. Obviously the same learned court did not the very next year after its promulgation consider it as conflicting with their views as expressed in the case of Slette v. Railroad, 55 N. W. 137, from which we have already quoted. Counsel have also cited us to the case of Petty v. Railroad, 179 Mo. 666, which was a crossing case in which the injured person was not on the track, but was approaching it and drove immediately in front of the approaching car, which according to her evidence could have been seen for a distance of 1200 feet before it reached the crossing. There was a light upon the

car and the gong was sounded, and yet the plaintiff drove immediately upon the track in front of the car, and the evidence showed that the motorman used every exertion to stop the car. Obviously that case is not in point here, and the same may be said also of Warner v. Railroad, 178 Mo. 1. c. 132, in which the court says there was absolutely no evidence whatever that the deceased was on the track when the car approached, etc.

Counsel also cite us to the case of McGrath v. Railroad, 197 Mo. 97. In that case, McGrath was on the day of the accident and for some time prior thereto employed by the defendant as a track repairer or laborer upon its tracks, and this court held upon review of all the evidence in the case that the particular negligence charged in the petition was not established, and cites the familiar doctrine of this court that, where the plaintiff chooses to allege specific acts of negligence, the burden of proving such specific negligence is upon him and the recovery if had at all must be upon the specific negligence pleaded. And it was held in that case that there was complete failure to prove the specific acts of negligence charged. But the court went also further and held that the demurrer to the evidence should have been sustained on the ground that the contributory negligence of the deceased barred recovery, and cited at length from the decision of this court in Evans v. Railroad, 178 Mo. 1. c. 517, in which Judge Burgess, speaking for the court, said: "It will not do to apply the [humanitarian] doctrine in all its strictness to sectionmen whose business it is to work upon and keep in repair railroad tracks, for they are supposed to look after their own personal safety, and to know of the time at which trains pass, to look for them and see them, and to move out of the way. It is common knowledge that these men often voluntarily wait until trains get dangerously close to

them, and then step out of danger and let them pass
by, and to require trains to stop upon all such occas-
ions, when sectionmen are discovered on the track at
work, would not only be imposing upon railroads un-
just burdens, but would greatly interfere with traffic
and travel. Those in charge of trains have the right
to presume in the first place that such persons will
keep out of danger, and not until they have good rea-
son to believe they will not do so, and then fail to use
all proper means at their command to prevent injur-
ing them, in consequence of which they are injured or
are injured by reason of the willful negligence of those
in charge of the train, should the defendant be held
liable, and there was nothing of that kind in this case."
To the same effect is Davies v. Railroad, 159 Mo. 1,
and Clancy v. Railroad, 192 Mo. 615. Recurring to the
Evans case an examination of the facts upon which that
opinion was predicated will show that Evans for four
or five years prior to his death had been laboring in
the employment of the railway company. The accident
occurred at Randolph on the 15th day of October, 1898.
On the day he was killed he was engaged in cutting
weeds along the railroad track at a point on or near
a road crossing one hundred and twenty-five yards east
of the Wabash depot in said town. At that time the
regular fast freight train east-bound, which was not
scheduled to stop at Randolph, passed that place at
2:12 in the afternoon. This train had been running
on that time-card for a long time prior to October 15,
1898, and was well known as a meat train. This train
was exactly on time on October 15, 1898, the train
whistled at the whistling post, a quarter of a mile west
of Randolph Station, and the bell ringer on the engine,
an automatic contrivance, was started at the time the
whistle was blown, so that the bell rung from the whist-
ling post until the train passed Randolph. It was a
clear day with the wind blowing from the southwest.

As the train was not scheduled to stop at Randolph, its speed was not slackened after whistling at the post, the engineer whistled one long blast as a station signal and then gave a short whistle as answer to a signal from the conductor not to stop. Seeing a group of men working close to the track near the crossing just west of Randolph, the engineer when three or four hundred feet west of the crossing whistled again a danger or warning signal, four short quick blasts. The men as the engineer saw them separated then, some on one side of the track and some on the other. After coming within sixty feet of the men, the engineer's view of them was shut off by the front part of the engine. Evans, the deceased, was never seen by either the engineer or the fireman in the position of danger or peril prior to the accident, in fact they did not know that anyone had been struck by the engine until after they had reached Lexington Junction, some distance east of Randolph station. All the eye-witnesses agreed that Evans never paid the slightest attention to the approach of the train though it was in plain view for at least a mile west of Randolph station. The other sectionmen both saw and heard the approaching train and kept out of its way, and while Evans walked east on the ends of the ties on the Hannibal track until the train was within sixty or seventy-five feet from him and then started across the defendant's track directly in front of the train, the foreman and two of the other section men shouted a warning to him in a loud voice. There was no rule in force as to signals to section men as each man was supposed to look out for himself. Under these facts it was said by this court: "It will not do to apply this rule [the humanitarian rule] in all its strictness to sectionmen whose business it is to work upon and keep in repair railroad tracks, for they are supposed to look after their own personal safety, and to know of the time at which trains

pass, to look for them and see them, and to move out of the way.'' As applied to the facts of that case the decision held that Evans's widow could not recover, and in our opinion was absolutely correct. There was not the slightest evidence of any negligence upon the part of the railroad, the signals were all given and heard by the by-standers, and the train was a regular train which passed every day at that hour and was exactly on time on the day Evans was killed. Evans was an old employee of the company and worked on that section and as said by the court it was his duty to know of the time at which the trains passed, to look for them and move out of the way. And those in charge of the train had the right to presume that he would keep out of danger, and not until the engineer had good reason to believe that Evans would not do so was he under obligation to stop his train. To require engineers to stop their trains whenever section men were discovered at work along the various sections of the track, would not only impose an unjust burden, but would greatly interfere with traffic and travel, and with that doctrine we are entirely satisfied. But that is not the case here. In this case Lynch was on a bicycle and in the performance of a duty imposed upon him by the company. He was as much entitled to the track as any train of the company. In the Evans case, the engineer gave all the usual cautionary signals of the approach of his train required by the statutes and common prudence; all the operatives working with Evans moved out of danger, and the engineer saw them do so. Evans was not on the track, but stepped from a place of safety immediately in front of the rapidly moving engine. In this case the evidence shows that not even a signal by a whistle was given to Lynch, and he was in plain view of the engineer and fireman for at least

a half mile with no knowledge of the approaching train or engine behind him. And as already said, he had no reason to expect this (wild) engine to follow him so closely after the passage of the passenger train. And it cannot be said as a matter of law that he was guilty of such contributory negligence as would prevent a recovery by his mother. But even if he had been guilty of contributory negligence, running as he was for a half mile or two-thirds of a mile in plain view of the engineer and fireman on this engine and having indicated in no way to them his knowledge of their approach, it was their plain and obvious duty to exercise reasonable care for his safety and not run over him. From the time they saw him and observed, as alleged in the defendant's answer, that he was not looking back and was ignorant of their approach, it was their duty to warn him and to slow down the train and stop if necessary in order to save his life. As was said by this court in Sullivan v. Railroad, 97 Mo. 118, "It appearing that the deceased had a right to be where he was, on the track; that his life could have been saved by the use of ordinary care by the defendant's servants operating the train, and that they failed to exercise such ordinary care, a demurrer to the evidence was rightfully overruled, although there was evidence tending to show that the deceased was guilty of negligence." See also Kelly v. Railroad, 95 Mo. 282; Hawley v. Railroad, 71 Iowa 717, 29 N. W. 787; Eppstein v. Railroad, 197 Mo. 720.

III. It is next insisted that the circuit court erred in overruling defendant's motion to strike out the amendment to plaintiff's petition. It appears that when the case was commenced the prayer in the petition was for damages to the amount of two thousand dollars. The action was commenced on the 10th of August, 1903. On the 21st day of January, 1904, the defendant filed an application for a change of venue and on the same

day, before the application for a change of venue was
awarded, the plaintiff by leave of the court amended
her petition by changing the amount sued for from
two thousand to five thousand dollars, to which the de-
fendant objected, but filed no term bill of exceptions.
The record then recites, "And thereupon and there-
after on January 21, 1904, defendant renews and pre-
sents to the court its application for a change of venue
in this cause, and the parties appearing by their attor-
neys and the application being by the court seen and
understood is sustained and the court orders that the
venue of this cause be changed and the case transferred
to the circuit court of Pike county of Missouri in the
tenth judicial circuit." It also appears from the rec-
ord that prior to the filing of this application for a
change of venue the cause had been continued, but the
continuance had been set aside on the motion of the
defendant. It thus appears that after the application
for a change of venue had been filed, the plaintiff, by
leave of the court over the objection of defendant,
amended her petition so as to make the prayer for
judgment for five thousand dollars instead of two thou-
sand dollars, as originally asked, and the contention is
that the circuit court of Audrain county was powerless
to allow the amendment or to take any step whatever
save to grant the change, the objection being to the
judge.

As said in Colvin v. Six, 79 Mo. 1. c. 200, "It is a
question of jurisdiction, and it has been held by this
court in construing the statute relating to change of
venue from the circuit court, that it *is the order of the
court of* a change which divests the court of jurisdic-
tion and confers it upon another court." [Henderson
v. Henderson, 55 Mo. 534; State v. Daniels, 66 Mo. 192;
State v. Hopper, 71 Mo. 425.] It has also been held
that a court which orders a change of venue retains
sufficient power to set it aside during the term. [State

v. Webb, 74 Mo. 333.] It must follow from the principles announced in these decisions that the court did not lose jurisdiction of the case by the mere fact of the application for a change of venue and that it retains jurisdiction until the order for the change has been made. These cases were afterwards approved in In the Matter of Whitson's Estate, 89 Mo. 58. When the application for the change of venue was made, without doubt the circuit court of Audrain had jurisdiction to determine its sufficiency or whether it had been timely made. If it had erroneously declined to grant it, its action would have been open to review by this court on appeal or writ of error upon proper exceptions saved. [Corpenny v. Sedalia, 57 Mo. 88.] It has been uniformly ruled by this court that the granting or refusing of an application for a change of venue is a matter of exception and must be preserved by a bill of exceptions filed in the court which erroneously makes or refuses the order at the term thereof when the order is made. [State v. Ware, 69 Mo. 332; State v. Nave, 185 Mo. 135; Keen v. Schnedler, 92 Mo. 524 and 525; Wright v. Kansas City, 187 Mo. 696, and cases cited.] Although defendant objected and excepted when the leave was granted plaintiff to amend her petition, it filed no bill of exceptions in the circuit court of Audrain county at the term or at any time and hence it cannot avail itself of the error, if any, in permitting the amendment. [Keen v. Schnedler, supra.] None of the authorities cited by defendant militate in the least against the conclusion we have reached on this point.

IV.   Having already ruled that the circuit court properly gave the first instruction and that there was ample testimony upon which to predicate it, it is unnecessary to notice this point further. The other objection to it is, we think, without merit and affords no ground for reversal.

V. The court's instruction, given of its own motion, is assailed because the last paragraph thereon reads, "In such case the absence of ordinary care cannot be inferred from the fact that defendant's agent did not in fact stop said engine before it struck said Lynch, if it did strike him." The contention is that the court assumes as a fact that "defendant's agent did not in fact stop said engine before it struck said Lynch." The clause when read in connection with the whole instruction is not fairly susceptible of the construction put upon it. We think, however, it was too favorable to defendant and it has no cause to complain of it. Indeed, the instructions given in behalf of the defendant were as favorable as it could ask, and if any error was committed in instructions it was against the plaintiff.

VI. Error is also assigned in the admission of evidence for plaintiff. The first assignment, to-wit, that the court erroneously permitted the witness to answer the question, "What position would the train crew take when you say a train is under control?" is not supported by any reason whatever, but we are referred to the record. Looking to that it appears the objection was that it was argumentative and immaterial. The witness having already testified that when a second train entered a block on which there was already another train, the train men of the second train should keep their train under control and move slowly and ready to stop on short notice, the answer needed no explanation and the attempt to make it clearer added nothing to it, but in no event could it have wrought any injury to defendant.

As to the proposition that the court erred in permitting witness Smith to testify as to the speed of the engine when it passed the coal chute a mile and a quarter west of where Lynch was killed, we think that the last announcement by this court in Banc, in Stot-

ler v. Railroad, 200 Mo. 124, justified the ruling of the circuit court. The duties of the witness required him to ascertain if trains were on time, and he always kept C. & A. time. He had resided at Higginsville twelve years and his work on top of the mine gave him a daily opportunity of observing the speed of trains passing the chute. He saw the engine in question as it came from Higginsville, noted it as it passed and watched it as it went east around the curve. He had ridden on trains on this road. In Stotler v. Railroad, supra, it was said, "Obviously it would be nonsense to say that a rate of speed could only be shown by expert testimony." [Walsh v. Railroad, 102 Mo. 1. c. 586; Aston v. Railroad, 105 Mo. App. 1. c. 231.]

Neither do we agree that the speed of the train at the coal chute was no evidence of the speed it was making a mile or a mile and a quarter further east, at which point it was running down grade. There was not a syllable of evidence that the train had slacked its speed and it was for the jury to draw the inference that it had continued at the rate it was last seen, when the distance was only a mile further east. In the absence of all whistling and any evidence whatever to the contrary, the fact that it was maintaining a certain speed at the coal chute, with no evidence of abatement, was a fact which the jury could consider, with the other evidence that it arrived in Corder only three minutes behind the regular passenger train, which reached Corder about on time.

We think there was no reversible error in permitting the witness Cramer to testify that when the engine and tender reached Corder that morning, there was no person on the rear end of it as it backed in. No objection was made to the question when it was asked. Counsel for defendant objected on the ground it was immaterial to any issue in the case. The court overruled this objection and defendant excepted. The

objections now urged for the first time were not made to the circuit court.

VII.  It is next objected that the court erred in permitting the witness Jacks to answer the question propounded to him by counsel for plaintiff with reference to the distance within which an engine and tender could be stopped.  It is earnestly insisted that the witness was not shown to be qualified to testify as an expert on the matter.  On this part of the objection, the testimony tended to show that the witness had been working at and about railroads and locomotives about seven years.  He had never been an engineer or fireman and had not operated an engine himself, but he testified that he had had occasion to see locomotive engines started and stopped, and the distance in which they could be stopped when running, and he had these opportunities for the last seven years. · He had ridden on engines and trains, had seen the engineer manipulate the appliances and he stated from his observations in this respect he knew the distance in which a train could be stopped when it consisted of nothing but an engine and tender.  That this evidence presented a question for expert testimony, we think there can be no doubt.  Just within what distance a train can be stopped in a given case with safety to property and the lives of persons thereon, must depend upon many things, the speed of the train, the grade of the track, the size of the train, the kind of brakes used, etc.  As said by BIGGS, J., in Gourley v. Railroad, 35 Mo. App. l. c. 92, "It is unreasonable to suppose that the judgment of a witness on such a subject, who had no practical knowledge in the running of trains, or had never given the subject any study, would be worth any more than the judgment of the jurors themselves."  In Eckert v. Railroad, 13 Mo. App. 352, the defendant introduced as a witness a builder of locomotives and offered to prove by him the distance within which a train could

have been stopped. The trial court refused to let the witness answer. Judge THOMPSON, in passing on this question, said: "A person long practiced in the building of locomotives and in running them on trial trips, would clearly be able to give an opinion as an expert on the matter submitted to him." We are inclined to the opinion that the witness in this case did not sufficiently qualify in order to testify as an expert. But the circuit court permitted him to testify. He was then asked, "Suppose a locomotive engine and tender, not a switch engine, but an engine such as used in freight service on the road in work service, supposing it was equipped with air and was being run down a straight track in dry weather, on a grade slightly down, and operated at a rate of fifteen or twenty miles an hour, with the train men in their proper places on the engine, in what distance could it be stopped so as not to endanger the persons on board or injure the train?" And he answered, "He would say between two and three hundred feet." Counsel for the defendant also objected to the hypothetical question for the reason that it was not shown in evidence what sort of an engine this particular engine was and there was no evidence that it was not a switch engine, or how it was equipped, and also objected that the speed of the train was not shown at the time of the accident, etc. But conceding that this witness was not competent to testify as an expert, the question is, should the cause be reversed for that reason? In Robertson v. Railroad, 84 Mo. 119, this court said that it might be error for the court to permit a witness, with no more knowledge than the jurymen, to give his opinion on the question, "but in order to be a ground of reversal the error must have been prejudicial to the defendant. There was no evidence introduced by the defendant showing that the opinion expressed by the witness was erroneous. And it could not be perceived how the defendant could be

prejudiced except upon the assumption that the opinion was contrary to the knowledge and observation of men. No one expressed or intimated anything to the contrary, and the defendant offered no evidence to prove that it was erroneous.'' In this case, likewise, it is difficult to see how the testimony of this witness on this point materially affected the issue. As already said, the deceased Lynch on his velocipede was on a straight track on a clear morning immediately in front of the engine and tender and the engineer and fireman had their faces turned in the direction in which the deceased was moving and with no obstruction whatever in the way, and the evidence shows, without contradiction, that he could have been seen for a half to two-thirds of a mile by the engineer and fireman before their engine collided with his velocipede. The answer of the defendant alleged in substance that the deceased did not look and observe the approach of the engine. No signal whatever was given him, and when the engineer and fireman observed, as they must have observed unless they shut their eyes, that he was making no effort whatever to leave the track with his velocipede, then it became their duty under the decisions of this court to give him a warning of their approach and exercise all reasonable care to avoid injuring him. And there was absolutely no evidence whatever that the engineer and fireman made any effort to stop the train, or were unable to do so in time to avoid the injury to the deceased. So that the evidence of the witness Jacks that the train could have been stopped within two or three hundred feet, in our opinion added no weight to the case made against the defendant. Had there been any evidence of the sudden appearance of the deceased upon the track three or four hundred feet ahead of the engine and tender, or any evidence whatever of any attempt to warn the deceased of the coming of the engine behind him, or any effort

whatever to stop the train and the failure to do so before striking him, then the evidence of the witness Jacks would have been material and it would have been error to have admitted it. But in view of all the facts already narrated we are of the opinion that the cause should not be reversed for this error.

VIII.  Lastly, it is urged that the plaintiff failed to prove her right to maintain this action because she did not prove, if it was a fact, that the deceased left no minor children surviving him. It was alleged in the petition that the plaintiff was a widow and John Lynch was her son and at the time of his death he was an unmarried minor under the age of twenty-one years, and left no children surviving him. That his father, the plaintiff's husband, was dead. The testimony showed that the plaintiff was the mother of John Lynch, the deceased, and that at the time of the bringing of the action she was a widow and that John Lynch at the time of his death was a little over twenty years of age and was single and unmarried. There was no proof either by the plaintiff or the defendant that John Lynch left any minor children or that he was ever married.

Section 640, Revised Statutes 1899, requires that "all motions shall be accompanied by a written specification of the reasons upon which they are founded; and no reason not so specified shall be urged in support of the motion." It is the settled law of this State that in order to have the action of a trial court reviewed in our appellate courts alleged errors not appearing on the face of the record proper must be called to the attention of the trial court by a motion for a new trial, otherwise they will not be considered. [State v. Gilmore, 110 Mo. 1; Railroad v. Carlisle, 94 Mo. 166; Bollinger v. Carrier, 79 Mo. 318.]

The fundamental principle of practice upon which these decisions are predicated is that it is the duty

of an appellant before appealing to an appellate court
to give the trial court an opportunity to correct its
error, if any, and thus obviate delay and the expense
of an appeal, and when this is not done, the appellate
court will not review the rulings of the trial or circuit
court upon the point. [Williams v. Railroad, 112 Mo.
l. c. 485, and cases cited.] And the motion for new
trial must *specifically* call the attention of the trial
court to the alleged errors. Has defendant complied
with the statutory command in this regard in its mo-
tion for new trial in this cause? The 12th ground in
the motion is in these words: "Because the verdict is
not supported by the evidence; and the cause being
founded upon a special statute the plaintiff did not
prove facts sufficient to bring herself and this cause
within the purview of such statute." In their brief
and argument in this court, learned counsel for defend-
ant assign as error that "plaintiff wholly failed to
prove her right to maintain this action because she did
not prove, if it was a fact, that deceased left no minor
children surviving him." Did the motion for new
trial, fairly considered, notify the circuit court of the
ground above urged for a reversal of its judgment?
Counsel had no difficulty to state the proposition plain-
ly and specifically in this court in the words last above
quoted. If they meant to rely upon this as a ground
for new trial, they should have stated it as specifically
in their motion for new trial as the statute and the
practice require. Instead of stating "plaintiff did
not prove facts sufficient to bring herself and this cause
within the purview of the statute," they should have·
gone further and added, "in this, that she did not prove
that the deceased left no minor children surviving
him." There was nothing in the motion for new trial
to indicate to the circuit court what facts plaintiff had
failed to prove, which defendant regarded as essential
to bring her case within the statute. This failure of

defendant to specifically direct the circuit court's attention to the claim now made is more obvious when the record is examined and no allusion is found to it anywhere in the oral testimony or in an instruction asked by defendant. Had the court's attention been specifically directed to the matter and it had ruled against defendant and an exception been saved, the defendant might with some plausibility insist it was unnecessary to repeat it in full, but to make a ground of its motion for a new trial in such general terms in regard to a matter nowhere mooted in the trial or instructions we think is contrary to the spirit of the statute, and to uphold such a practice would encourage the laying of traps for an adversary and the circuit courts. The courts and adversary parties are entitled to meet in the open adjustment of the solemn business affairs of life.

This court, in Sweet v. Maupin, 65 Mo. 65, construed section 640, Revised Statutes 1899, then section 48, 2 Wag. Stat. 1872, page 1021. In that case there were several counts in the petition and the jury returned a general verdict. The fourth clause of the motion for new trial was that "the verdict of the jury is not warranted by the issues in the case and is *incorrect and informal.*" In the Supreme Court the verdict was assailed on the ground that it was a general one and not a finding on each count. It was conceded by this court that if the attention of the trial court had been called to a defect of that sort by appropriate motion, a reversal must occur, but said the court: "Our statute expressly requires that motions *shall distinctly specify* the ground whereon they are based (2 Wag. Stat. 1021, sec. 48). The object of this is to call the attention of the lower court to the point complained of. For mere matters of exception cannot be noticed here except when 'expressly decided' by the lower court. [Id. 1067, sec. 32; State v. Rucker, 59 Mo. 17, and other

Missouri cases.] We hardly think, in the light of these statutory provisions and decisions, the motion specified with sufficient distinctness the ground now relied on, that the verdict did not contain a special finding on each count.'' A motion for rehearing was filed in that case in this court and this court rendered an exhaustive opinion, reviewing all the cases and adhering to the opinion first handed down. It was ruled that errors like the one alleged in this case must be *pointedly* called to the attention of the trial court, or they will not be reviewed by this court.

We think the motion was insufficient to justify a review of the point raised in the brief of defendant.

But if the motion for new trial had contained an appropriate specification of the ground now relied on, still we think the judgment should not be reversed. The plaintiff established affirmatively that she was the mother and only surviving parent of John Lynch at the date of his death and that he was at that time a minor, single and unmarried. There was not the slightest suggestion during the trial that John Lynch had ever been married or that he had a minor child surviving him at the time of his death. Conceding there is no presumption, either that John Lynch, the deceased, was married or unmarried, still the ordinary rule is that men do not marry before reaching their majority and when it was affirmatively shown he was single and unmarried at the time of his death and was a minor, in the absence of the slightest suggestion that he had ever been married and no offer to show by newly-discovered evidence that he had in fact been married and left a minor child, or children, the jury were justified in finding he had no minor children or child surviving him, and to reverse this judgment to have the fact that he left no minor child established would be in our opinion trifling with justice. The judgment of the circuit court is affirmed.

*Fox, P. J.,* and *Burgess, J.,* concur.